# NO. 12-15-00024-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *THE STATE OF TEXAS FOR THE* | § | *APPEAL FROM THE* |
| *BEST INTEREST AND PROTECTION* | § | *COUNTY COURT AT LAW* |
| *OF N. K.* | § | *CHEROKEE COUNTY, TEXAS* |

## MEMORANDUM OPINION

N.K. appeals from an order for temporary inpatient mental health services, and an order authorizing the Texas Department of State Health Services (the Department) to administer psychoactive medication. In two issues, N.K. asserts the evidence is legally and factually insufficient to support the trial court's orders. We affirm.

## BACKGROUND

An application for court ordered temporary mental health services was filed requesting the trial court to commit N.K. to the Rusk State Hospital (the Hospital) for a period not to exceed ninety days. At the time the application was filed, N.K. was a patient at the Hospital. The application was supported by two physician's certificates of medical examination for mental illness. The first certificate stated that George Howland, M.D. examined and evaluated N.K. and diagnosed her with bipolar disorder I manic with psychotic features. Troy Caldwell, M.D. also examined and evaluated N.K. and diagnosed her with bipolar disorder, mixed phase.

According to Dr. Howland and Dr. Caldwell, N.K. was mentally ill; was suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of her ability to function independently; and was unable to make a rational and informed decision as to whether or not to submit to treatment. Dr. Howland also found that N.K. was likely to cause serious harm to herself or others. As the basis for his opinion, Dr. Howland reported that N.K. said the hospital was bugging her telephones, that her family was

watching her, that she did not want antipsychotic medications, and that she did not "get manic." Further, he stated that N.K. was reportedly aggressive towards her family and that she was impulsive, had poor hygiene, was paranoid that the hospital was bugging her telephones, and had thoughts of harming herself at another facility.

Dr. Caldwell stated that the bases for his opinion included, among other reasons, that N.K. appeared to have paranoid delusions or hallucinations; was very agitated and threatening towards a nurse; said that a person who called her from an apparent call center had given her trouble; accused her parents of being sociopathic, abusive, and after her money; and refused to go to his office for a visit because she claimed that he would make her stay at the hospital, make her take medications, transfer her to a horrible place, and call security. Further, Dr. Caldwell stated that N.K. "preferred" not to provide her birthdate in order to confirm her identity; had a history of treatment for bipolar disorder; "ruminat[ed]" about having cancer and reportedly lost her job based on these fears; was fearful that she would be forced to take medications that would "kill her"; alleged that her telephone and iPad were being tapped or monitored; and, according to her sister, had no money and was only able to live with her parents. Dr. Caldwell also signed an application for an order to administer psychoactive medications to N.K.

The trial court held a hearing on the applications. Afterward, the trial court found, by clear and convincing evidence, that N.K. was mentally ill, and was suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of her ability to function independently, exhibited by N.K.'s inability, except for reasons of indigence, to provide for her basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. The trial court rendered an order for temporary inpatient mental health services, committing N.K. to the Hospital for a period not to exceed ninety days. The trial court also rendered an order authorizing the Department to administer psychoactive medications to N.K. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In her first issue, N.K. argues that the evidence is legally and factually insufficient to support the order for temporary inpatient mental health services.

2

## Standard of Review

In a legal sufficiency review where the burden of proof is clear and convincing evidence, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.* This does not mean that we are required to ignore all evidence not supporting the finding because that might bias a clear and convincing analysis. *Id.*

The appropriate standard for reviewing a factual sufficiency challenge is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, we consider all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27-29. Further, we must consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

## Temporary Inpatient Commitment Order

The trial judge may order a proposed patient to receive court ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that the proposed patient is mentally ill and, as a result of that mental illness, she is likely to cause serious harm to herself, is likely to cause serious harm to others, or is (i) suffering severe and abnormal mental, emotional, or physical distress, (ii) experiencing substantial mental or physical deterioration of her ability to function independently, which is exhibited by her inability, except for reasons of indigence, to provide for her basic needs, including food, clothing, health, or safety, and (iii) unable to make a rational and informed decision as to whether or not to submit to treatment. TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (West Supp. 2014).

"Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). To be clear and

convincing under this statute, the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm either the likelihood of serious harm to the proposed patient or others, or the proposed patient's distress and the deterioration of her ability to function. TEX. HEALTH & SAFETY CODE ANN. § 574.034(d) (West Supp. 2014). The statutory requirements for an involuntary commitment are strict because it is a drastic measure. *In re C.O.*, 65 S.W.3d 175, 182 (Tex. App.—Tyler 2001, no pet.). We must examine the record to determine where there is clear and convincing evidence showing a continuing pattern of behavior that tended to confirm the likelihood of N.K.'s distress and the deterioration of her ability to function. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(d).

**Analysis**

At trial, Dr. Howland's and Dr. Caldwell's certificates of medical examination for mental illness were admitted into evidence. N.K. did not appear at the hearing. Dr. Caldwell testified that he diagnosed N.K. with bipolar disorder, mixed phase. However, he stated that N.K. was very guarded and he was concerned that her degree of paranoia was not fully explained by a bipolar diagnosis. Thus, Dr. Caldwell wanted to "rule out" a possible diagnosis of schizoaffective disorder. He testified that N.K.'s behaviors indicate she is suffering from a mental illness and he believed she needed treatment at the hospital. According to Dr. Caldwell, N.K. refused treatment because she did not believe that she had a mental illness. She also refused to come to his office because she felt unsafe and did not believe she was "crazy," that she had done anything wrong, or that she needed to come to court.

Dr. Caldwell testified that N.K. showed a continuing pattern of behavior affecting her ability to function independently on a daily basis. He stated that N.K.'s paranoid delusions were very subtle, couched, and hidden because she knew it sounded a little "crazy." As an example of her continued pattern of behavior, he said, N.K. told him that an anonymous person called from an 800 number and said that her name was "Sarah." N.K. had a person in her life with the same name who had given her trouble in the past. Thus, she concluded, the person from the 800 number was "that" Sarah. Dr. Caldwell said that N.K. would not tell him why she thought so and kept her reasoning hidden. He stated that not talking about her reasoning was such "an exaggerated modus operandi for her" that he was not surprised when she did not appear at the hearing.

4

Moreover, Dr. Caldwell testified that N.K. has experienced excessive vaginal bleeding. He said that medical personnel wanted to rule out the possibility of her having cancer. At that point, he said, N.K. became obsessed about having cancer and would not go to work. She refused to allow medical personnel to conduct tests or determine whether she had cancer because she was afraid it would "get on her record" and she would lose her job. Dr. Caldwell stated that N.K. did not take care of her safety needs when she refused to cooperate with blood draws for her medical conditions and to follow up on medical recommendations in order to obtain a definitive diagnosis. He described N.K. as having "illogical obsessive paranoid kind of fears" that paralyzed her.

According to Dr. Caldwell, N.K. did not give him permission at first to talk to her family or provide a release to obtain medical records from outside the hospital. Thus, he did not know if N.K. could live with her parents. Dr. Caldwell called it part of her "extreme secrecy." He said that he and the hospital staff had recently been allowed to talk to N.K.'s sister. Dr. Caldwell discovered that N.K. did not have an apartment as she had previously claimed and did not have any money. N.K.'s sister told him that when N.K. stays with her parents, she will call law enforcement and allege that her parents are doing something to thwart her. She has also accused family members of tapping her telephone and computer. Dr. Caldwell stated that N.K. was reportedly verbally aggressive towards her family members and had thoughts of harming herself. N.K.'s family also reported that she was losing jobs, could not organize herself to apply for jobs, and had "gone downhill."

The evidence that N.K. refused to accept treatment or obtain a definitive diagnosis for her excessive vaginal bleeding, coupled with her paranoia, paralyzing fear of a cancer diagnosis that caused her to lose jobs, and refusal to cooperate with medical personnel, satisfies the requirement of evidence of a continuing pattern of behavior showing N.K.'s distress and the deterioration of her ability to function. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a), (d). Considering all the evidence in the light most favorable to the findings, we conclude a reasonable trier of fact could have formed a firm belief or conviction that N.K. is mentally ill and as a result of that illness is suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of her ability to function independently; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See*

5

*id.*; *In re J.F.C.*, 96 S.W.3d at 266. Consequently, the evidence is legally sufficient to support the trial court's order.

Having determined that the evidence is legally sufficient to support the order, we address factual sufficiency and consider all the evidence, both that in support of and contrary to the trial court's findings. *In re C.H.*, 89 S.W.3d at 25. Dr. Caldwell testified that he believed N.K. would be able to communicate her basic needs outside of a hospital setting. He stated that she was a speech pathologist with a college degree and a teaching certificate. According to Dr. Caldwell, N.K. did not believe she was mentally ill and did not believe that she needed treatment. However, in light of the entire record, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that N.K. was mentally ill and as a result of that illness is suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of her ability to function independently; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(d); *In re J.F.C.*, 96 S.W.3d at 266. Therefore, the evidence is factually sufficient to support the trial court's order. We overrule N.K.'s first issue.

**Psychoactive Medication Order**

A trial court may issue an order authorizing the administration of one or more classes of psychoactive medications to a patient who is under a court order to receive inpatient mental health services. TEX. HEALTH & SAFETY CODE ANN. § 574.106(a) (West 2010). The court may issue an order if it finds by clear and convincing evidence after the hearing that (1) the patient lacks the capacity to make a decision regarding the administration of the proposed medication, and (2) treatment with the proposed medication is in the best interest of the patient. **Id.** § 574.106(a -1).

N.K. argues that because the evidence is legally and factually insufficient to support the trial court's order for temporary inpatient mental health services, the trial court erred in ordering the administration of psychoactive medications. However, we have determined that the evidence is legally and factually sufficient to support the trial court's order for temporary inpatient mental health services. Therefore, the trial court's order authorizing the Department to administer psychoactive medications to N.K. is also valid. *See id.* § 574.106(a). We overrule N.K.'s second issue.

6

## DISPOSITION

Having overruled N.K.'s first and second issues, we ***affirm*** the trial court's orders.

<u>**GREG NEELEY**</u>
Justice

Opinion delivered July 22, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

JULY 22, 2015

NO. 12-15-00024-CV

**THE STATE OF TEXAS FOR THE BEST
INTEREST AND PROTECTION OF N. K.**

Appeal from the County Court at Law

of Cherokee County, Texas (Tr.Ct.No. 41,263)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the trial court's orders.

It is therefore ORDERED, ADJUDGED and DECREED that the trial court's orders for temporary inpatient mental health services, committing N.K. to the Hospital for a period not to exceed ninety days, and authorizing the Department to administer psychoactive medications to N.K. **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*